UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| ERIC ERICSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12-cv-00178-JAW |
| | ) | |
| MARTIN MAGNUSSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS**

In this case, a prisoner complains of prison conditions that allegedly constrain his religious practices. The Prison Litigation Reform Act requires that a prisoner exhaust available administrative remedies before bringing an action under federal law with respect to prison conditions. The Court grants summary judgment for the Defendants because the prisoner failed to exhaust available administrative remedies.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On June 4, 2012, Eric Ericson, an inmate at the Maine Correctional Center in Windham, Maine, filed a Complaint under the Civil Rights Act, 42 U.S.C. § 1983, against a number of Correctional and Medical Provider Defendants. *Compl.* (ECF No. 1). Following the Court's resolution on January 31, 2013, of motions to dismiss and a motion to modify the Complaint, the following allegations remained: (1) restriction of access to religious services, *see Compl.* at 1-2 ("First Cause of Action");

(2) restriction of access to religious materials, *see Compl.* at 5 ("Sixth Cause of Action"); (3) denial of programs for "refusing an indoctrination class contrary to [his] religious beliefs," *see Mot. to Modify Compl. to Add Add'l Const. Violations to Bring Compl. Current to Today's Date* ¶ 1 (ECF No. 41) (*Mot. to Modify*); and (4) order to remove five of the twenty books in his cell, *see Mot. to Modify* ¶¶ 7, 30. *Order Affirming Recommended Decision of the Magistrate Judge and Granting in Part and Denying in Part Pl.'s Mot. to Modify Compl.* (ECF No. 49).

On March 7, 2013, Mr. Ericson filed a "Motion to Leave to File an Amended Complaint." *Mot. to Leave to File an Am. Compl.* (ECF No. 55). The Defendants opposed the motion on March 28, 2013. *Response in Opp'n to Mot. to Amend Compl.* (ECF No. 60). Mr. Ericson replied on April 10, 2013. *Reply to Opp'n of Mot. to Amend Compl.* (ECF No. 67).

On March 20, 2013, Mr. Ericson filed a motion for reconsideration of the Court's January 31, 2013 Order. *Mot. to Reconsider Order Affirming Recommended Decision of the Magistrate Judge and Granting in Part and Denying in Part Pl.'s Mot. to Modify Compl.* (ECF No. 59). The Defendants opposed the motion on April 8, 2013. *Opp'n to Mot. for Recons.* (ECF No. 64). Mr. Ericson replied on April 15, 2013. *Reply to Opp'n of Mot. for Recons.* (ECF No. 68).

Mr. Ericson made an additional filing on April 1, 2013 that the Clerk treated as a motion for a preliminary injunction. *Mem. of Law* (ECF No. 61); *see Letter from the Clerk's Office to Mr. Ericson* (ECF No. 62). The Defendants opposed the motion on April 18, 2013. *Resp. in Opp'n to Mot. for Prelim. Inj.* (ECF No. 72). On April 30,

2013, Mr. Ericson filed a "Motion for Ruling Injunctive Relief Sought." *Mot. for Ruling Inj. Relief Sought* (ECF No. 77). He replied to the Defendants' opposition on May 1, 2013. *Reply in Opp'n to Mot. for Prelim. Inj.* (ECF No. 79). The Defendants opposed his April 30, 2013 motion on May 14, 2013. *Resp. in Opp'n to Mot. for Inj.* (ECF No. 85). Mr. Ericson replied on May 21, 2013. *Reply to Resp. in Opp'n to Mot. for Inj.* (ECF No. 86).

On April 18, 2013, the Defendants moved for summary judgment. *Mot. for Summ. J.* (ECF No. 74) (*Defs.' Mot.*); *Statement of Material Facts* (ECF No. 75) (DSMF). Mr. Ericson opposed the motion on May 2, 2013. *Opp'n to Mot. for Summ. J.* (ECF No. 80) (*Pl.'s Opp'n*). The Defendants replied on May 6, 2013. *Reply to Resp. to Mot. for Summ. J.* (ECF No. 81) (*Defs.' Reply*). The Defendants' Attorney filed a letter with the Court on May 7, 2013, correcting a misstatement contained in the Defendants' Reply. *Letter from James E. Fortin to Hon. Margaret Kravchuk* (ECF No. 82). Mr. Ericson made additional filings on May 10, 2013, and June 11, 2013. *Add'l Attachs.* (ECF No. 83); *Add'l Attachs.* (ECF No. 89).

On May 22, 2013, Mr. Ericson filed a motion for subpoenas. *Mot. for Subpoenas* (ECF No. 87). The Defendants opposed the motion on June 10, 2013. *Resp. in Opp'n to Mot. for Subpoenas* (ECF No. 88).

### B.   Mr. Ericson's Pro Se Status

In responding to the Defendants' motion for summary judgment, Mr. Ericson made little attempt to comply with Local Rule 56(c), which provides:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts.

> The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule.

D. ME. LOC. R. 56(c). He denied some of the Defendants' factual assertions in his opposition to the motion for summary judgment, which includes a section called "Opposition to Statement of Material Facts," but did not respond to the Defendants' statement of material facts paragraph by paragraph and only occasionally supported his denials with record citations. *Pl.'s Opp'n* at 1-11.

Pro se litigants are not held to the same strict standards as attorneys when it comes to technical rules of procedure. In the words of the First Circuit,

> as a general rule, we are solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects.

*Dutil v. Murphy*, 550 F.3d 154, 158 (1st Cir. 2008). At the same time, "pro se status does not free a litigant in a civil case of the obligation to comply with procedural rules." *Rivera v. Riley*, 209 F.3d 24, 28 n.2 (1st Cir. 2000). Here, Mr. Ericson made little attempt to comply with an important procedural rule that the Defendants brought to his attention in their motion. *Defs.' Mot.* at 17 ("Plaintiff's attention is directed to Local Rule 56(c), which requires that [stating the requirements]"); *Defs.' Reply* at 2 (citing *Demmons v. Tritch*, 484 F. Supp. 2d 177, 183 n.7 (D. Me. 2007)).

Mr. Ericson prefaces his opposition to the motion for summary judgment with the following statement:

> I will do my best to respond to this request for a summary judgment without benefit of counsel or access to the law library, legal computers

4

and other legal tools.  But first, I want to preserve for the record my requests and reasons for a court appointed attorney, access to the law library, legal computers and other legal tools have been denied and/or ignored by the U.S. District Court.

I am a layman and have no idea what the citations quoted contain or if Shepardized, it would show they are no longer applicable.  Since the Defendants have blocked my access to the law library, legal computers and other legal tools preventing me from researching other case law, I am effectively blindsided and impotent.

*Pl.'s Opp'n* at 1.  Mr. Ericson did not need a law library to comply with Local Rule 56(c), however.  The Court expects pro se plaintiffs to make at least a good faith effort to comply with the procedural rules that govern the lawsuits they initiate.  Mr. Ericson's failure to do so makes it more difficult to ascertain what facts are genuinely in dispute.  Nevertheless, the Court has endeavored to match the factual contentions in Mr. Ericson's opposition to the Defendants' statement of material facts.

### C.     The Facts[1]

Eric Ericson has been incarcerated at the Maine Correctional Center (MCC) since September 1, 2011, having been transferred to that facility from the Maine State Prison.  DSMF ¶ 1.  Mr. Ericson was at first placed in the general population at MCC but was transferred to protective custody in October 2012.  DSMF ¶ 2.  Due to Mr. Ericson's perception that his cellmate posed a threat to him and a lack of bed space, Mr. Ericson was transferred to the MPU's segregation unit in January 2013.[2]

---

[1]      Following "the conventional summary judgment praxis," the Court recounts the facts in the light most favorable to the non-movant's case theories, consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

[2]      The Defendants stated it was "[d]ue to threats he made against an inmate in the protective custody unit" that Mr. Ericson was transferred to the segregation unit.  Mr. Ericson denies this.  *Pl.'s Opp'n* at 9.  The Maine Department of Corrections Emergency Observation Status Placement that

*Pl.'s Opp'n* at 9. Prisoners at MCC are placed in protective custody when the administration determines that their safety or security will be threatened if they remain in general population; the decision to keep a prisoner in protective custody is reviewed on a weekly basis. DSMF ¶ 4. Because of threats to their safety from inmates in the general population, prisoners in protective custody are not allowed contact with general population inmates. DSMF ¶ 5. They are kept in a separate housing unit. *Id.* When it is necessary to go to chow or some other activity, they move as a group at times when they will not be in contact with general population inmates. *Id.* They are not allowed to attend group activities such as recreation and religious services with the rest of the inmate population. *Id.*

The protective custody unit at MCC can house up to 24 prisoners in 12 cells; as of April 18, 2013, it was nearly full. DSMF ¶ 6. Three correctional officers are assigned to supervise this unit, two patrolling the floor and one in a control tower with a view of the unit. *Id.* It would be impracticable in terms of staffing to allow protective custody inmates to attend group activities, as it would take many times more corrections officers to ensure their safety if they were allowed to mingle with the general population. *Id.*

Because of the restrictions on their contact with other prisoners, those in the protective custody unit cannot attend group religious services outside the unit.[3]

---

Mr. Ericson submitted to the Court states that he was placed on "emergency observation" status because Mr. Ericson "felt that his cellmate may pose a threat to him unless he could live somewhere else." *See Reply in Opp'n to Mot. for Prelim. Inj.* Attach. 12 (ECF No. 79-12).

[3]      Largely without supporting evidence, Mr. Ericson disputes the Defendants' account of the religious services available to him:

DSMF ¶ 7.  However, they are allowed to possess religious texts and materials, they may visit the library where additional religious materials are kept, they may hold their own religious meetings and devotional or study groups within the unit, and the facility's chaplain conducts weekly services in the unit.  *Id.*  Protective custody prisoners may also receive visits from their own clergy, and the chaplain is available for individual ministry and counseling for these prisoners if they request it.  *Id.*  In addition, the chaplain would consider requests for specific religious items or services if asked.  *Id.*

Under the Department's Policy No. 24-3, governing the practice of religion at adult facilities, religious ceremonies must be scheduled through the chaplain,

---

I am not allowed worship services in the MPU building.  I am not allowed sacraments throughout MCC.  What bible study is offered is censored throughout MCC.  My God commands us to worship together and to assemble on Sundays by the apostle examples.  What sacraments offered are not biblical, as offered by the Episcopalians and Catholics.  Baptism is not offered throughout MCC.  Biblical precepts such as prohibitions against homosexuality is censored and prohibited from discussion in bible studies and worship services. . . .

Inmates in PC are entitled to what general population is entitled to.  The chaplain being open to consider requests either ignores them or denies them this statement is "lip service" only.  The chaplain is merely a puppet for the D.O.C.  I am a Protestant.  The chaplain is a Catholic nun and only advocates and teaches her Catholic religion.  That is primarily man made, unbiblical doctrine and unbiblical practices.  Contrary to her lies, I have discussed bible study in the security building.  She states it is not allowed because there are plenty of other (to her) bible studies she authorizes.  These other bible studies are censored as already mentioned.  I have told and shown her how to get free bibles, greeting cards and a baptismal.  We are still short bibles and have no greeting cards for religious holidays or birthdays plus we do not have a baptismal after nearly two years.  She states there is no need for a baptismal because MCC is not for long sentences (wrong again) and there is not enough time to prepare a person for baptism.  Maybe per her man made religion, but not according to the bible, God's word.  The bible shows baptism immediately after salvation.  The bible is explicit that we are to have a male leader for our worship services.  The chaplain will not provide one including me, an ordained minister.  She and as shown in Exhibit J10, Docket 55 will not allow this despite the policies and procedures stating that I can.  She will not allow a storage locker either despite the policies and procedures stating otherwise.

*Pl.'s Opp'n* at 8-10.

7

require the approval of the facility's chief administrative officer, and must be supervised by the chaplain, a member of the staff, or an outside volunteer.  DSMF ¶ 8.  The policy provides that prisoners may request a particular religious item or practice not currently allowed by submitting a written request through the chaplain or other designated staff for approval by the chief administrative officer.  DSMF ¶ 9. The policy also allows for accommodation of religious feasts if they are recognized requirements of a religion; these must be requested and scheduled through the chaplain.  DSMF ¶ 10.

At no time during his incarceration at MCC has Mr. Ericson requested special religious accommodation through the chaplain.  DSMF ¶ 11.  The only request he has made to the chaplain was an inquiry regarding help with the disposal of excess property he was not allowed to keep.  *Id.*  The chaplain accepted his donations of a CD of sermons, which she is holding in the chapel and is willing to return to him when he is released.  *Id.*

When he was in general population at MCC, Mr. Ericson was an active participant in many chapel activities.  DSMF ¶ 12.  He attended Sunday service, Protestant communion once or twice a month, and three or four Bible studies a week.  *Id.*  In addition, Mr. Ericson signed up for Bible studies and other special programs when sign-ups were required.  *Id.*  Because of the limited space in the protective custody unit, the small number of inmates housed there, and the small number of men interested in services, one religious service per week is all that is offered there.  *Id.*  Mr. Ericson frequently participates in this service.  *Id.*

The Department of Corrections has a policy governing the personal property that prisoners are allowed to possess. DSMF ¶ 13. That policy specifies that prisoners may keep as many as fifteen books, newspapers, and magazines in their cells. *Id.* In addition, prisoners are allowed to keep political or religious materials (such as brochures, pamphlets, or catalogs) provided they can fit into a legal-size accordion folder. *Id.* The restriction on the number of books is due to space constraints, given the size of the cells and the fact that many are shared by two inmates; security concerns, as books are sometimes used as hiding places for contraband, and as a cell search is more difficult the more property in the cell; and the increased fire hazard caused by a large amount of paper in a confined space. DSMF ¶ 14. The fifteen-book limit applies to all types of books, including religious books. *Id.* Prisoners who are required to divest themselves of excess books must choose one of five options: (1) ship home at the prisoner's expense; (2) take home on furlough; (3) have picked up by designated person; (4) donate to the MCC for re-issue; or (5) place into trash.[4] *Id.* However, this option is not available on the Personal Property Release Form. *Pl.'s Opp'n* at 4.

---

[4]    The Defendants stated that excess books may "be stored and returned to [the prisoner] on a rotating basis, so long as the number they possess at one time does not exceed fifteen." DSMF ¶ 14. Mr. Ericson denies this in his opposition:

> There is no provision as claimed to put excess books into storage and returned on a rotating basis. This is another lie. If such a system were available, it would be in writing and others would know about it. This option is not available on the Personal Property Release Form (see Exhibit X1) I was forced to sign and wrote on it under protest and is why they will not copy for me (see Exhibit X3). I also wrote under protest on the money transfer form (see Exhibit X2). If the storage provision was available and with my documented protest, don't you think I would have availed myself of it? I even asked to donate the books to the chaplain. I was told OK, but they were shipped off unbeknownst to the chaplain who said she would take them.

9

In November 2012, it was observed that Mr. Ericson had twenty books in his cell. DSMF ¶ 15. He was ordered to remove the excess books from his cell.[5] *Id.*

As part of the Department's classification procedures, an Individual Case Plan is developed for each prisoner; the plan may include referrals to specific programs designed to help the prisoner reduce his risk of re-offending. DSMF ¶ 16. Prisoners are expected to participate in the programs designated in their Individual Case Plans. DSMF ¶ 17. A prisoner may not be subjected to formal discipline for failing or refusing to participate in the services designated in his case plan, but refusal or failure to comply with the case plan will result in loss of the privilege to participate in any community-based program, such as a Community Transition Program or any program in which the prisoner can earn money. *Id.*

---

This storage provision is a lie and as with all the lies, the Attorney General and the Court should prosecute for perjury.

*Pl.'s Opp'n* at 4. The Defendants support their statement with citations to the affidavits of Brian Libby, Deputy Superintendent of MCC, and Shawn Emerson, a corrections captain at MCC. The relevant paragraph of Mr. Libby's affidavit does not mention a rotating storage option, although it does state that a prisoner who has more than fifteen books "is given an opportunity to donate the books to the library." DSMF Attach. 1, *Aff. of Brian Libby* ¶ 10 (ECF No. 75-1). The relevant paragraph of Mr. Emerson's affidavit states that "[i]t would have been possible for Ericson to request that the facility store his extra books and return them to him on a rotating basis," but provides no further explanation. DSMF Attach. 2, *Aff. of Shawn Emerson* ¶ 10 (ECF No. 75-2).

Viewing the evidence in the light most favorable to Mr. Ericson, the Court amends the statement of fact to reflect the options on the Personal Property Release Form. *See Pl.'s Opp'n* Attach. 1 (ECF No. 80-1). It is not clear what the option "[d]onate to the Maine Correctional Center for re-issue" entails but the word "donate" suggests that the property would become available to all prisoners, and would not necessarily be accessible on demand by the donor. None of the other options suggests a system of rotational storage.

[5]     The full sentence proposed by the Defendants states, "Ericson was ordered to remove the excess number of books from his cell and either send them out or have the facility store them." DSMF ¶ 15. In accordance with its obligation to view the facts in the light most favorable to Mr. Ericson, and based on Mr. Ericson's assertion that storage at the facility was not an option, which is supported by the Personal Property Release Form, the Court omitted the portion of the statement suggesting that storage was an option.

"Thinking for a Change" is a cognitive behavioral modification program for offenders developed by and through the National Corrections Institute of the United States Department of Justice; a description of the program is available at the Institute's web site, http://nicic.gov/T4C.   DSMF ¶ 18.   The program consists of three components: cognitive self-change, social skills, and problem solving skills. DSMF ¶ 19.   Inmates are taught a concrete process for self-reflection aimed at uncovering antisocial thoughts, feelings, attitudes, and beliefs.   *Id.*   The social skills instruction prepares inmates to engage in social interactions based on self-understanding and consideration of the impact of their actions on others.   *Id.* Problem-solving skills provide inmates with an explicit, step-by-step process for addressing challenging real-life situations.   *Id.*   The program consists of two sessions per week for twelve weeks.   *Id.*   The program has no religious content or basis; it is based upon psychological principles of cognitive behavioral modification. DSMF ¶ 20; *Pl.'s Opp'n* at 4-6.

The sex offender program at MCC is known as R.U.L.E., an acronym for Responsibility, Understanding, Learning, and Experience.   DSMF ¶ 21.   The program has been developed over a number of years by Dr. Barbara Schwartz, a clinical psychologist who conducts the program at MCC.   *Id.*   The R.U.L.E. program is widely employed in the correctional field to treat sex offenders.   DSMF ¶ 22.   It is based on scientific principles of psychology, including cognitive behavior modification, and employs a number of techniques and exercises to help inmates

recognize and change their behavior.  *Id.*  The program does not have any religious content and does not require or encourage belief in a deity.  *Id.*; *Pl.'s Opp'n* at 4-6.

As part of his Individual Case Plan, Eric Ericson is required to participate in the Thinking for a Change program and the facility's R.U.L.E. sex offender program.  DSMF ¶ 23.  Mr. Ericson has refused to participate in either program, stating that he cannot in good conscience attend "heretic and pagan programs that are secular in nature."  DSMF ¶ 24.  Mr. Ericson states that his "Christian, biblical God forbids his people from being involved with this" and asserts that "if the programs were built on a Christian foundation and the counselors were Christians, [his] objections would be non-existent."  *Pl.'s Opp'n* at 5.  Mr. Ericson also contends that, "regardless of [his] Christian biblical concerns," he did not attend Dr. Barbara Schwartz's program because, in his view, she violated his confidentiality and privacy rights by discussing him.  *Id.* at 6.  As a result of his refusal to participate in these recommended programs, Mr. Ericson is ineligible for any community-based programs or paid employment.  DSMF ¶ 24.

The Department of Corrections has in place a grievance policy (Policy 29.01) by which a prisoner can request "administrative review of any policy, procedure, practice, condition of confinement, action, decision or event that directly affects the client, that he/she believes is a violation of his/her rights or is in violation of departmental policies and procedures, and for which he/she believes a departmental

employee or contractor is responsible."[6]  DSMF ¶ 25.  The grievance policy provides three levels of review.  DSMF ¶ 26.  A grievance is initiated when the prisoner files a grievance form with the facility's grievance review officer.  *Id.*  At that point, the grievance is logged in and assigned a sequential identifying number.  *Id.*  The grievance officer reviews and investigates the grievance and makes an initial decision.  *Id.*  If the prisoner is dissatisfied with the grievance officer's response, he may appeal the decision to the facility's chief administrative officer (the superintendent).  *Id.*  Ultimately, the superintendent's decision may be appealed to the Commissioner.  *Id.*

The grievance policy was amended in 2012 to require prisoners filing grievances or appealing grievance decisions to set forth the grounds for their grievance or appeal in the space provided on the grievance or appeal form.  DSMF ¶ 28.  The policy prohibits setting forth the grounds for the grievance or appeal in an attached letter or memorandum.  *Id.*  Prior to the institution of this policy change, inmates would routinely submit lengthy letters or other writings setting forth their grievances.  DSMF ¶ 29.  These were often difficult to read or understand, often raised multiple, sometimes unrelated issues, and included facts not relevant to the grievance.  *Id.*  The purpose of the revised policy is to force prisoners to state their grievances clearly and concisely and to allow the officers investigating the grievances to focus efficiently only on the issue presented rather than on any number of extraneous issues and irrelevant allegations.  DSMF ¶ 30.

---

[6]     Mr. Ericson asserts that "[t]he grievance system is broken," is "designed to prevent access to the courts," and does not work as stated by the Defendants, but he does not support his assertions with any evidence.  *Pl.'s Opp'n* at 6.

Mr. Ericson has filed seven third-level grievance appeals with the Commissioner since he has been incarcerated, but none of these contains a complaint regarding the practice of religion.[7]  DSMF ¶ 27.  On November 8, 2012, Mr. Ericson filed a grievance after being ordered to send out five books that he had in excess of the allowed fifteen books.  DSMF ¶ 31.  The grievance officer at MCC denied his grievance, citing the policy limiting the number of books a prisoner can possess and noting that the policy applied to all books, whether or not of a religious nature.  DSMF ¶ 32.  Mr. Ericson appealed this decision to Defendant Burnheimer, who upheld the grievance officer's decision.  DSMF ¶ 33.  Both the initial grievance and the first appeal complied with the policy requirement that the statement of grounds be limited to the space provided on the form.  *Id.*  Mr. Ericson then filed an appeal of the superintendent's decision to the Commissioner; however, he did not comply with the policy requiring him to limit his statement of the appeal to the space provided on the form but instead attached a letter/memorandum setting forth his arguments in support of the appeal.  DSMF ¶ 34.  The appeal was therefore rejected by the grievance review officer, who returned the papers to Mr. Ericson on the same day they were received.  *Id.*  Mr. Ericson did not correct the error or attempt to re-file the appeal.[8]  *Id.*

---

[7]     Mr. Ericson asserts that he has "filed not less than four religious based grievances," but he supports this assertion with evidence of only one such grievance.  *Pl.'s Opp'n* at 6-7.

[8]     Mr. Ericson maintains that "once a grievance is dismissed, it cannot be resubmitted," but does not support this statement with any evidence.  *Pl.'s Opp'n* at 6.  He argues that he "exhausted all grievances submitted by the Draconian system designed to dismiss and once dismissed, no appeal procedure is allowed which violates my due process."  *Id.* at 7.

     Mr. Ericson mentions that "the [grievance] discussed by the Defendants can be found in the K exhibits with explanation appealing outside the grievance system to the Commissioner and Governor in Exhibits K23 and K24 in Docket 56."  *See Add'l Attachs.* (ECF No. 56).  Mr. Ericson

## II.    THE PARTIES' POSITIONS

### A.    The Defendants' Motion

The Defendants argue that summary judgment is appropriate because Mr. Ericson failed to exhaust the administrative remedies available to him before bringing his lawsuit, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(1)(a).   *Defs.' Mot.* at 8-10.   They contend that "he did not exhaust his administrative remedies under the grievance process with regard to any issues pertaining to religion," and that his "attempt to appeal the decision on his religious books grievance was rejected because it did not comply with the grievance procedure, and Ericson did not correct the deficiency or attempt to re-file the appeal." *Id.* at 9.

The Defendants assert that Mr. Ericson's claim for injunctive and declaratory relief as to the Maine State Prison is moot, since he is no longer housed there. *Id.* at 10.   They note that Mr. Ericson has alleged "no specific incidents of withholding of religious materials while at MCC." *Id.*

The Defendants maintain that on the undisputed facts, their policies regarding Mr. Ericson's religious practices do not violate his rights under the First Amendment or RLUIPA. *Id.* at 11-16.   They argue that a difference in the opportunities available to prisoners in protective custody as compared to those in

received a memo from "D. Shipman, GRO," on January 2, 2013, noting that Mr. Ericson's appeal did not comply with Policy 29.01, Procedure E, Paragraph 1 and 2, which states that "[a] prisoner may use only this form to submit an appeal.  Any attempt by a prisoner to submit an appeal via letter or in any other way shall not be accepted." *Add'l Attachs.* Attach. 21, Memo (ECF No. 56-21).  The memo stated not that Mr. Ericson's appeal had been "dismissed" but that it was "not accepted," and that Officer Shipman was "returning [Mr. Ericson's] appeal form and [his] appeal attachment." *Id.*

general population does not violate their rights to equal protection or due process of law. *Id.* at 11. They say that Mr. Ericson's claim of denial of opportunities for religious exercise must be analyzed under the First Amendment and RLUIPA, rather than by comparing religious opportunities available to him with those available to other inmates not in protective custody. *Id.* The Defendants discuss *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), and contend that it supplies the proper analytic framework for this case. *Id.* at 11-12. They contend that the restrictions imposed by MCC on Mr. Ericson's practice of religion are reasonable, that restrictions on the ability of segregated inmates to engage in religious practices do not constitute a substantial burden under RLUIPA, and that requiring Mr. Ericson to participate in non-religious programs like Thinking for a Change and R.U.L.E. does not violate his constitutional rights. *Id.* at 12-15.

The Defendants argue that restricting Mr. Ericson to fifteen books at a time does not impose a substantial burden on his ability to practice his religion. *Id.* at 15-16. They distinguish *Washington v. Lem*, 497 F.3d 272 (3d Cir. 2007), as involving a prisoner whose religious beliefs required him to read at least four different Afro-centric books a day, whereas here, Mr. Ericson has not explained how the limit conflicts with his beliefs. *Defs.' Mot.* at 16.

### B.   The Plaintiff's Opposition

In his opposition, Mr. Ericson explains that his lack of counsel and access to the law library has left him "impotent" to argue his case. *Pl.'s Opp'n* at 1. He does not discuss the law that governs his case, claiming he is unable to, but disputes—

sometimes vigorously—the Defendants' factual assertions.  *Id.* at 1-11.  The Court

has worked Mr. Ericson's factual contentions into its recitation of the facts.

### C.    The Defendants' Reply

The Defendants begin their reply by noting that Mr. Ericson's opposition fails

to comply with Local Rule 56(c).  *Defs.' Reply* at 1.  They observe that "[a] good deal

of what Ericson states in his opposition is speculative, rhetorical, and unsupported

by substantial evidence."  *Id.* at 3.  They note that Mr. Ericson's complaint about

the therapeutic programs is that they are not religious, and that meeting his

requirements would force them to violate the Establishment Clause.  *Id.* at 3.  They

again observe that Mr. Ericson has failed to explain why his religious beliefs require

that he have more than fifteen books at a time.  *Id.* at 3-4.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  FED. R. CIV. P. 56(a).  For summary judgment purposes, "genuine"

means that "a reasonable jury could resolve the point in favor of the nonmoving

party," and a "material fact" is one whose "existence or nonexistence has the

potential to change the outcome of the suit."  *Tropigas de Puerto Rico, Inc. v.*

*Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations

omitted).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Phair*, 708 F. Supp. 2d at 61 (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).  However, the Court is not "required to 'accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement' made by a party." *Bonefant-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 123 (1st Cir. 2011) (quoting *Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008)). The summary judgment standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." *Nieves-Romero v. United States*, No. 12-1193, 2013 U.S. App. LEXIS 9089, *5 (1st Cir. May 3, 2013) (quoting *Hannon v. Beard*, 645 F.3d 45, 58 (1st Cir. 2011)).

## B.    The Prison Litigation Reform Act

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  To exhaust available administrative remedies under the PLRA, a prisoner must "complete the administrative review process in accordance with the applicable

procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). The PLRA's exhaustion requirement applies to RLUIPA claims. 42 U.S.C. § 2000cc-2(e) ("Nothing in this Act shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 . . ."); *Cutter v. Wilkinson*, 544 U.S. 709, 723 n.12 (2005).

**C.    Analysis**

Under the PLRA, Mr. Ericson must complete the administrative review process described in the Department of Corrections' grievance policy before bringing an action with respect to prison conditions. The Department of Corrections' grievance policy allows a prisoner to file a grievance with the facility's grievance review officer, and to appeal an adverse decision first to the facility's superintendent and then to the Commissioner. The custodian of records reviewed the files and located seven appeals to the Commissioner filed by Mr. Ericson, but none containing a religion-based complaint. In his opposition to the motion for summary judgment, Mr. Ericson asserts that "the grievance system is broken," and that he has "filed not less than four religious based grievances." *Pl.'s Opp'n* at 6.

Mr. Ericson's assertion that the grievance system is "broken" is unsupported and belied by the record, which contains examples of prison officials giving due consideration to Mr. Ericson's grievances. Mr. Ericson's assertion that he filed not less than four religion-based grievances, even if true, does not meet the PLRA's requirement that he "complete the administrative review process in accordance with the applicable procedural rules" before bringing suit. *Woodford*, 548 U.S. at 88. Here, completing the administrative review process required appealing an adverse

decision to the superintendent and then to the Commissioner.  There is no evidence that Mr. Ericson attempted to appeal any religion-based grievance to the Commissioner with one exception: his grievance concerning the number of books he could have in his cell at one time.  Upon attempting to file that appeal, however, Mr. Ericson was promptly notified that the appeal was "not accepted" because it failed to comply with the Prisoner Grievance Policy's requirement that a prisoner state the grounds for the appeal in the space provided on the appeal form.  *See Add'l Attachs.* Attach. 21, *Memo from D. Shipman, GRO, to Eric Ericson (1/2/2013)* (ECF No. 56-21).

Mr. Ericson tries to excuse his failure to comply with prison policy by asserting that "once a grievance is dismissed, it can not be resubmitted."  *Pl.'s Opp'n* at 6.  This argument is not persuasive.  The appeal was not denied on its merits; it was returned to Mr. Ericson with an explanation for why it had not been accepted.  The explanation gave no indication that Mr. Ericson could not have resubmitted an appeal that complied with the policy, and Mr. Ericson provides no support for this contention.  As the undisputed evidence establishes that Mr. Ericson failed to "complete the administrative review process in accordance with the applicable procedural rules," the PLRA precludes him from bringing an action under federal law.  *Woodford*, 548 U.S. at 88.  The Court grants summary judgment for the Defendants.

### D.     Other Motions

The Court denies Mr. Ericson's Motion [for] Leave to File an Amended Complaint (ECF No. 55) as futile since the proposed amendments would not affect the Court's PLRA analysis.  *See Calderón-Serra v. Wilmington Trust Co.*, No. 11-2449, 2013 U.S. App. LEXIS 7971, *12 (1st Cir. Apr. 22, 2013) (the Court "may deny leave to amend [for] . . . futility . . . ").  The Court denies Mr. Ericson's Motion to Reconsider Order Affirming Recommended Decision of the Magistrate Judge and Granting in Part and Denying in Part Plaintiff's Motion to Modify Complaint (ECF No. 59) because it fails to demonstrate "that the order was based on a manifest error of fact or law."  D. ME. LOC. R. 7(g).  The Court dismisses all other pending motions as moot.

## IV.    CONCLUSION

The Court DENIES Eric Ericson's Motion to Leave to File an Amended Complaint (ECF No. 55) and Eric Ericson's Motion to Reconsider Order Affirming Recommended Decision of the Magistrate Judge and Granting in Part and Denying in Part Plaintiff's Motion to Modify Complaint (ECF No. 59).  The Court GRANTS the Defendants' Motion for Summary Judgment (ECF No. 74).   The Court DISMISSES as moot Eric Ericson's Memorandum of Law[9] (ECF No. 61), Eric Ericson's Motion for Ruling Injunctive Relief Sought (ECF No. 77), and Eric Ericson's Motion for Subpoenas (ECF No. 87).

---

[9]     The Clerk's Office docketed this filing as a motion for preliminary injunction.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 12th day of June, 2013